UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| Plaintiff, | : | CASE NO. |
| | : | |
| | : | JUDGE BLACK |
| v. | : | |
| | : | **INFORMATION** |
| FIRSTENERGY CORP., | : | |
| | : | 18 U.S.C. §§ 1343, 1346, 1349 |
| Defendant. | : | |
| | : | FORFEITURE ALLEGATION |

**THE UNITED STATES ATTORNEY CHARGES**:

At times material to this Information:

1. Defendant **FirstEnergy Corp.** was an Akron, Ohio–based public utility holding company. Between approximately 2016 until in or about February 2020, **FirstEnergy Corp.** was the parent company to entities involved in energy generation, including the entity formerly known as FirstEnergy Solutions ("FES"). As of November 16, 2016, FES had a separate and independent Board of Directors from **FirstEnergy Corp.**, and on March 31, 2018, FES filed for Chapter 11 bankruptcy protections. **FirstEnergy Corp.** also served as the parent company for FirstEnergy Service Company ("FirstEnergy Service"), which provided financial and other corporate support services to **FirstEnergy Corp.** and its subsidiaries. **First Energy Corp.** and its subsidiaries were regulated by federal and state governmental agencies.

2. The Ohio House of Representatives was an elected body of the Ohio General Assembly. Members of the Ohio House of Representatives served two-year terms and were limited to four consecutive two-year terms. House members proposed, advanced, and voted on legislation, including legislation regulating utilities.

1

3. The Speaker of Ohio was the leader of the Ohio House of Representatives. The Speaker guided the agenda of the chamber, presided over the House session, and provided direction to House members and staff. The Speaker also decided when bills reach the House floor for a vote and who served in leadership positions in the Speaker's caucus. The Speaker named all committees and subcommittees and appointed all members and chairs to committees and subcommittees.

4. The Speaker was elected at the beginning of every General Assembly, which convened its first regular session on the first Monday of January in odd-numbered years. To choose a Speaker, representatives-elect of the majority caucus in the House nominated and voted for a candidate for Speaker. The Speaker candidate who received an absolute majority of those votes was then voted on by all House members during the first session day of the General Assembly.

5. Public Official A represented the State of Ohio's 72 District in the Ohio House of Representatives from approximately January 2017 until June 2020. He also served as the Speaker of the Ohio House of Representatives from January 7, 2019 until July 30, 2020.

6. Between 2017 and March 2020, FirstEnergy Service paid more than $59 million ($16,904,330.86 attributed to **FirstEnergy Corp.** and $43,092,505 attributed to FES) to Generation Now – a purported 501(c)(4), which **FirstEnergy Corp.** knew was operated for the benefit of and controlled by Public Official A, upon its inception in early 2017.

7. FirstEnergy Service made payments to Generation Now through Partners for Progress, an entity that was incorporated in Delaware on or about February 6, 2017, weeks after **FirstEnergy Corp.** senior executives traveled with Public Official A on the **FirstEnergy Corp.** jet to the presidential inauguration in January 2017. On or about February 8, 2017, Partners for

Progress registered as a foreign nonprofit Corp. in Ohio, specifically as a 501(c)(4) entity "to engage in activities consistent with those permitted of an organization exempt from tax under Section 501(c)(4) of the Internal Revenue Code.…"

8. Although Partners for Progress appeared to be an independent 501(c)(4) on paper, in reality, it was controlled in part by **FirstEnergy Corp.** executives, who funded it and directed its payments to entities associated with public officials. For example, **FirstEnergy Corp.** executives directed the formation of Partners for Progress and decided to incorporate the entity in Delaware, rather than Ohio, because Delaware law made it more difficult for third parties to learn background information about the entity. **FirstEnergy Corp.** executives were also involved in choosing the three directors of Partners for Progress, two of whom were **FirstEnergy Corp.** lobbyists. Before Partners for Progress was formally organized, a FirstEnergy executive directed that $5 million be designated for an unnamed 501(c)(4) in December 2016.

9. **FirstEnergy Corp.** exclusively funded Partners for Progress through payments from FirstEnergy Service, which totaled approximately $25 million between 2017 and 2019, approximately $15 million of which was wired to Generation Now. **FirstEnergy Corp.** executives directed Partners for Progress to make payments in 2018, 2019, and 2020, including payments to Generation Now, which helped conceal **FirstEnergy Corp.** as the source of the payments from the public.

10. **FirstEnergy Corp.** made payments to Public Official A through Public Official A's 501(c)(4), Generation Now, in return for Public Official A taking specific official action through the passage and enactment into law of nuclear legislation for **FirstEnergy Corp.'s** benefit in Public Official A's capacity as a public official. Use of 501(c)(4) entities was central to the scheme because it allowed certain **FirstEnergy Corp.** executives and co-conspirators to conceal

from the public the nature, source, and control of payments to and for the benefit of Public Official A.

11. The Public Utilities Commission of Ohio ("PUCO") regulated and oversaw providers of utility services, including electric companies, natural gas companies, and telecommunications companies to ensure Ohioans have access to safe and reliable utilities. Per the PUCO's mission, it promulgated rules and ensured the enforcement of those rules as well as state law. As a part of its regulatory responsibility, the PUCO regularly made decisions that affected the financial outlook of **FirstEnergy Corp.**

12. The PUCO was comprised of five commissioners appointed to rotating, five-year terms by the governor of Ohio. "[A]ny Ohioan who is not employed by a public utility and does not have a financial interest in a public utility can apply for an open seat." After considering the resumes of applicants, a 12-person nominating council recommended four finalists to the Ohio governor, who either appointed a commissioner from the list or requested another slate of names from the council. The Ohio governor's appointment was confirmed by the Ohio Senate.

13. Public Official B was one of the five commissioners of PUCO, serving as Chairman of PUCO from April 2019 until November 21, 2020, when Public Official B resigned.

14. Prior to serving as the Chairman of PUCO, Public Official B worked for a private law firm and served as the general counsel for an industrial group of energy users, whose interests often conflicted with **FirstEnergy Corp.'s** interests. Public Official B also was the sole owner of Company 1 and Company 2, both of which entered a contract with **FirstEnergy Corp.** in 2010. Public Official B, through Company 1, also entered into a consulting services agreement with **FirstEnergy Corp.**, through FirstEnergy Service in 2013, which was subsequently amended in 2015 but not executed by the parties. The 2015 amendment coincided with and was made in

exchange for Public Official B's industrial group withdrawing its opposition to a 2014 PUCO Electric Security Plan settlement package involving **FirstEnergy Corp.'s** Ohio electric distribution subsidiaries. The amended agreement called for an increase in Public Official B's retainer and supplemental payments through 2024. Although the amended agreement was not executed, from 2015 through June 2018, **FirstEnergy Corp.** paid into the Company 1 account pursuant to the terms of the agreement with Public Official B. Invoices from Company 1 were structured to bypass **FirstEnergy Corp.'s** Level of Signature Authority levels for purposes of internal approval of the payments.

15. On or about January 2, 2019, **FirstEnergy Corp.** wired $4,333,333, through FirstEnergy Service, to Company 1 for Public Official B's benefit. The $4,333,333 payment represented the remaining payment amounts designated in the unexecuted amended consulting agreement from 2019 through 2024. **FirstEnergy Corp.** was under no legal obligation to make the payment at that time. Pursuant to its scheme, FirstEnergy Corp. executives made efforts to advance the appointment of Public Official B as PUCO Chairman so that Public Official B could further FirstEnergy Corp.'s interests in that role through official action.

16. **FirstEnergy Corp.** paid the $4,333,333 to Company 1 for Public Official B's benefit with the intent and for the purpose that, in return, Public Official B would perform official action in Public Official B's capacity as PUCO Commissioner and Chairman to further **FirstEnergy Corp.'s** interests relating to passage of nuclear legislation and other specific **FirstEnergy Corp.** legislative and regulatory priorities, such as voting on matters before the PUCO, drafting and pursuing legislation on **FirstEnergy Corp.'s** behalf, and pressuring and advising other public officials to do the same, as requested and as opportunities arose.

## COUNT ONE
### (Conspiracy to Commit Honest Services Wire Fraud)

17. The allegations contained in paragraphs 1 through 16 are realleged and incorporated as if set forth fully herein.

18. From in or about 2016 through 2020, in the Southern District of Ohio and elsewhere, the defendant, **FirstEnergy Corp.**, through the acts of its officers, employees, and agents, conspired with others known and unknown to commit honest services wire fraud, that is, to devise and intend to devise a scheme and artifice to defraud the public of its right to the honest services of Public Official A and Public Official B through bribery and concealment of material information, and for the purpose of executing the scheme, using wire communications in interstate and foreign commerce.

**In violation of 18 U.S.C. §§ 1343, 1346, 1349.**

## FORFEITURE ALLEGATION

Upon conviction of the offense set forth in Count One of this Information, the defendant, **FirstEnergy Corp.**, shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), any property, real or personal, which constitutes or is derived from proceeds traceable to such violation, including but not limited to a sum of money which represents the amount of proceeds the defendant obtained as a result of the offense and the following specific property:

a. Contents of PNC Bank, Account No. ending in 5348, in the name of Partners for Progress Inc. in the amount of $6,366,476.29; and

b. Contents of PNC Bank, Account No. ending in 3639, in the name of Partners for Progress Inc. in the amount of $108,960.32.

## **SUBSTITUTE ASSETS**

If any of the property described above, as a result of any act or omission of the defendant:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), as incorporated by 28 U.S.C. § 2461(c), to seek forfeiture of any other property of the defendant, up to the value of the property described above.

VIPAL J. PATEL
ACTING UNITED STATES ATTORNEY

*Emily N. Glatfelter /Matthew C. Singer*
**EMILY N. GLATFELTER**
**MATTHEW C. SINGER**
**Assistant United States Attorneys**